IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 7, 2011

**STATE OF TENNESSEE v. ANTHONY S. HARDING**

**Appeal from the Criminal Court for Sumner County**
**No. 393-2009    Dee David Gay, Judge**

**No. M2011-00597-CCA-R3-CD - Filed January 25, 2013**

The Defendant, Anthony S. Harding, was convicted by a Sumner County jury of six counts of aggravated statutory rape and one count of attempted aggravated statutory rape. The trial court later dismissed the attempt conviction. Following a sentencing hearing, the trial court ordered the Defendant to serve four years on each count of aggravated statutory rape, with all of these counts to run consecutively, resulting in an effective twenty-four-year sentence. On appeal, the Defendant raises the following issues for our review: (1) whether the indictment was insufficient for failing to provide specific dates for the offenses; (2) whether the evidence was sufficient to sustain the convictions; (3) whether the trial court erred by excluding testimony from an alibi witness; and (4) whether the trial court imposed an excessive sentence. Following our review, the Defendant's convictions and sentences for aggravated statutory rape are affirmed. We remand solely for the entry of corrected judgment forms to reflect dismissal of Count Seven, the attempt conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Robert Thomas Vaughn (at trial) and Jon J. Tucci (on appeal), Nashville, Tennessee, for the appellant, Anthony S. Harding.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sallie Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On May 7, 2009, a Sumner County grand jury returned an indictment against the twenty-seven-year-old Defendant, charging him with eight counts of aggravated statutory rape of the sixteen-year-old female victim, F.P.,[1] Class D felonies. See Tenn. Code Ann. § 39-13-506(c), (d)(3). All of the charges stemmed from incidents occurring sometime in January or February 2009 and involved either intercourse or oral sex. The indictment alleged that "between on or about January 10, 2009 and on or about February 18, 2009," the Defendant engaged in intercourse with the victim (Count One) and had the victim perform fellatio on him (Count Five). "[O]n or about late January 2009," the Defendant was again alleged to have engaged in fellatio with the victim (Count Two). In Counts Three and Four, it was alleged that the Defendant had intercourse with the victim "on or about January 2009." Count Six charged performance of fellatio by the victim on the Defendant "on or about early February 2009." Specific dates of intercourse were provided for in Counts Seven and Eight, "on or about February 15, 2009," and "on or about February 18, 2009," respectively.

At trial, the victim provided that her birthdate was August 25, 1992, making her sixteen years old when the alleged offenses were committed. She stated that she lived in a two-bedroom apartment with her mother in Hendersonville in late 2008 and early 2009. At that time, she was freshman in high school. While living in the neighborhood, she befriended two other teenage girls, S.H. and C.L. The victim first met the Defendant when S.H. introduced them; the Defendant was S.H.'s uncle and also lived in the neighborhood. When S.H. moved to Gatlinburg, the victim and the Defendant exchanged cell phone numbers "so [the victim] could supposedly stay in contact with [S.H.]" Thereafter, the Defendant and the victim talked "quite a bit," mainly through text messaging. According to the victim, she began to trust the Defendant and often confided in him.

During this timeframe, the Defendant got married and moved to Gallatin, away from the victim's neighborhood. The victim testified that she did not go to the Defendant's house for the wedding or reception. They continued to frequently exchange text messages; he would instruct her to erase them. The victim stated that the Defendant was listed in her phone as "No name."

According to the victim, in late 2008, the relationship began to change, becoming sexual in nature. The Defendant told the victim that they would both get in trouble if she told anyone: "He said that he would go to jail and [she] would go to juvy [sic]." The victim testified that she went to Florida for New Year's Eve in 2008 and returned to Hendersonville on January 4, 2009.

---

[1] It is the policy of this court to refer to victims of sexual abuse by their initials. Moreover, we will refer to other individuals in this opinion by their initials when necessary to protect the identity of the victim.

Sometime after the Defendant moved to Gallatin, the Defendant asked her to meet him "[b]y the yacht club . . . or by the creek in the woods." According to the victim, this area was basically a boat dock, which was about five minutes walking distance from her apartment. The victim testified that the Defendant would park his vehicle on the other side of a green dumpster. She described that "normally" she would meet the Defendant while "he would be walking down the street" and that they then "would proceed from the street over to the woods by the creek." They often met at this location at night. She testified that the encounters were quick: "Let's get to it and leave."

She stated that when they met at this location, they "would end up having sex." She described that she would be standing up holding on to a tree and that the Defendant would penetrate her vaginally from behind. She could not recall whether the Defendant ever ejaculated. The victim testified that she had never had sex before meeting the Defendant. According to the victim, the Defendant did not use a condom, and she worried about becoming pregnant. The victim testified that sometimes they engaged in oral sex, which she described as "[her] putting [her] mouth on his penis."

The victim testified that the Defendant told her that "[they] were not having sex." According to victim, she asked the Defendant "if he had put it all the way in[,] and he proceeded to say that . . . 'it's ten inches, sweetie, if I put it in you would feel it.'" When asked approximately how many times she had intercourse with the Defendant, the victim estimated "probably about [twenty]." She further stated that they engaged in oral sex on at least five or six occasions. When asked if the Defendant ever threatened her, the victim replied, "He told me that I had to do what he said or he would get mad and that wouldn't be good. If I moved he would come and find me." She did not feel like she could tell anyone about their encounters.

According to the victim, all of the incidents occurred at the boat dock except one that occurred during the daytime at the Defendant's house in Gallatin. The victim stated that she had never previously been to the Defendant's house. According to the victim, the Defendant told her that he had a hot tub at his house, so the Defendant picked her up to take her to his house to use it. She described that, when they arrived, the Defendant said his wife's sister was home. They parked in the garage, and the Defendant went into the house first. He then returned and told her that she could go inside. She never saw anyone else while inside the house.

According to the victim, when they entered the house, they went straight to the bedroom, and he closed the door. The victim stated that she then changed into her bathing suit, and they sat down on the bed. The victim then performed oral sex on the Defendant;

according to the victim, this was the first time they had engaged in oral sex. She further testified that she was never able to get into the hot tub.

The victim then testified as to her recollection of February 18, 2009, "when everything kind of broke loose." She went to school that day. That afternoon she received a call from C.L. while she was with the Defendant at the boat dock. They were having intercourse, and C.L. overheard the Defendant's voice on the phone. Based on the conversation with C.L., the victim decided to go home. When the victim arrived at her house, her mother was home, and her mother took her cell phone from her.

Initially, the victim did not tell her mother what was going on with the Defendant because she was scared. The victim told her mother and her aunt that the voice in the background on the phone call with C.L. "was a friend from school." She confirmed that she sent the Defendant a text message stating "that [she] thought they bought [her] story."

On February 19, 2009, she went to school and had band practice that afternoon. Her mother picked her up from practice and took her to the police station. She was "scared to death." Once they arrived, she met with Detective Neal Harris of the Hendersonville Police Department. She told Det. Harris "everything that had been going on between [her] and [the Defendant." She was relieved to finally tell someone because she wanted the relationship to stop.

The victim then reviewed the details of the statement she gave to Det. Harris. She confirmed that the first time she had intercourse with the Defendant was shortly after her January 4, 2009 return from Florida. She told Det. Harris "a few days" after January 11, she again had sex with the Defendant for a second time. "[A] few days" after the second time, they had sex for a third time. All of these incidents happened at the boat dock.

Again, the victim testified that the first incident of oral sex occurred at the Defendant's house. She also stated that, although she could not recall an exact day, sometimes they would only have oral sex at the boat dock. According to the victim, oral sex happened on "more than one occasion." When asked the last time she performed oral sex on the Defendant, the victim replied that it was "sometime close to the time that [she] had talked with Detective Harris." She thought it was possibly the day before.

She confirmed that she met with the Defendant during the late evening hours of February 15 at the boat dock. She reaffirmed that she had intercourse with the Defendant at the boat dock on February 18, which was the time C.L. called and the day her mother became suspicious.

The victim testified that Det. Harris directed her to text the Defendant in an effort to try and get him to respond. The Defendant did not respond. The victim and her mother returned to the police station on February 20. Again, under the direction of Det. Harris, the victim initiated contact with the Defendant. The Defendant called the victim, and a tape recording of that call was played for the jury.

In the last text messages between the victim and the Defendant, the Defendant spoke of God and religion. She believed that "[t]owards the end" of the investigation, the Defendant was becoming suspicious.

The victim admitted that the text messages she sent to the Defendant about physical abuse by her mother were untrue. She stated that she made up the abuse because she "wanted it to stop. Sympathy that maybe that day it wouldn't happen." According to the victim, she had received therapy after these events and continued to do so. She felt like it was "helping."

On cross-examination, the victim was first asked about the details of the February 15 meeting. The victim testified that she met with the Defendant after 10:00 p.m. that evening, but she could not be more specific with the time. Defense counsel then referred to the following texts from the early morning hours of February 16, 2009: At 12:19 a.m., the victim texted the Defendant, "Meet you." Five or six minutes later the Defendant responded "Tonight." She replied "Ya." The Defendant then asked "When," and she said at 12:29 a.m., "N Ten." At 12:41 a.m., the victim texted "Hello." The following morning at 7:31 a.m. the Defendant said "Sorry fell asleep."

Defense counsel also asked the victim about the alleged oral sex at the Defendant's house in January 2009. She was asked to describe the house. The victim relayed that she entered the house through the garage door and, once inside, "you go through the kitchen" and it was a "straight shot to the bedroom." According to the victim, the bed in the Defendant's room was on the left-hand side of the room. She went on to describe additional details about the room, including a television on "a little shelf, bookshelf, some type of support for it to sit there, on the right-hand side, kind of close to the entrance of the bedroom." She also remembered that the garage door was already open when they arrived at the house.

Regarding the incident on February 18, she believed that the sun "was just starting to go down" when she left her house to meet the Defendant at the boat dock. When asked if there was anything distinctive about the Defendant's penis, the victim replied that it was "[l]arge, very round, obviously, and long." She did not recall any other unique characteristics.

She also confirmed that C.L. had seen a text message from the Defendant asking to meet and that C.L. later called her and heard the Defendant's voice, causing C.L. to become suspicious. C.L. told her mother, who told the victim's mother.

She confirmed that, after her interview at the police station, she took Det. Harris to her residence to collect clothing. Detective Harris asked her what she was wearing on the evening of February 18, when they had intercourse. Her pants and underwear were collected for DNA testing. She was later informed that no DNA was found on her clothing. Also, sometime thereafter, the victim's mother took her to the doctor for an examination.

On redirect, the victim stated that she met with the Defendant almost "every other night pretty close together." When asked about the results of her examination at the doctor's office, the victim confirmed that she had been diagnosed with a sexually transmitted disease.

The victim's mother also testified, confirming many of the details provided by the victim. The victim's mother worked as a medical assistant at Vanderbilt Medical Center. The victim's mother did have a boyfriend, but he was gone "on the road" most of the time. According to the victim's mother, the victim did not see her father much during this period of time. The victim's mother stated that, after they moved to the apartment complex in Hendersonville, the victim began to have a change in her personality, "becoming more withdrawn than usual."

On February 18, 2009, the victim's mother received a phone call from C.L.'s mother, who asked the victim's mother to come to her house because she needed to talk with her. After the television show American Idol was over, the victim's mother went to C.L.'s mother's house, and both C.L. and her mother were there. According to the victim's mother, C.L. was the victim's "very best friend." Based on this conversation with C.L. and her mother, the victim's mother returned home and confiscated the victim's cell phone.

The victim's mother looked through the victim's phone for information about who the victim had been texting. She was suspicious about the entry "No name." Originally, the victim told her mother that "No name" was a friend from school. The victim denied having a relationship with anyone other than her boyfriend. The victim's mother called her sister to come over and help her with the victim. Eventually, the victim admitted that "No name" was the Defendant.

When the victim went to school on February 19, 2009, the victim's mother kept her cell phone to see if the Defendant would try to contact the victim again. The Defendant did text message the victim, and the victim's mother responded to the messages as though she were the victim. Some of the messages were alarming to the victim's mother, "[t]ext like

-6-

asking questions about undressing in front of band members." After receiving these messages, the victim's mother went to the Hendersonville Police Department and showed the text messages to authorities. Thereafter, the victim's mother picked the victim up from school and brought the victim to the police station so she could be interviewed. She confirmed that Det. Harris interviewed the victim, and she stated that she was not in the room during the interview. While she sat in the lobby of the police department, the victim's cell phone continued receiving text messages from the Defendant.

On cross-examination, the victim's mother estimated that C.L.'s mother called at around 8:50 p.m. on February 18. This estimation was based upon what time American Idol came on that evening. She went to speak with C.L.'s mother after the show was over.

Detective Harris also testified. At approximately 5:30 p.m. on February 19, 2009, Det. Harris went to the police station to meet with the victim and her mother. Thereafter, Det. Harris interviewed the victim, and she disclosed the details of her sexual relationship with the Defendant. Detective Harris determined that the Defendant's birthday was June 16, 1981, making the Defendant ten years and ten months older than the victim.

After Det. Harris completed the interview with the victim, he met again with the victim's mother, and the three of them proceeded to Det. Harris's office. Detective Harris wanted to set up a phone call between the Defendant and the victim, but he was unsuccessful on February 19. Detective Harris stated that the victim and the Defendant communicated mainly through text messaging and there were "[v]ery few calls."

Detective Harris then went with the victim and her mother back to their house to collect the victim's clothing. He took the clothes the victim "believed she may be wearing on the 18th when the last reported incident occurred." The victim was not one-hundred percent sure that those were the correct items of clothing. Detective Harris confirmed that, following testing by the Tennessee Bureau of Investigation ("TBI"), no semen was found on the victim's clothing.

Detective Harris also escorted the victim from her home to the boat dock, "the location she had described." He photographed that location, and those photographs were entered as exhibits. According to Det. Harris, the walk took approximately five minutes.

The following day, February 20, the victim returned with her mother to the police station. Detective Harris testified that, overnight, additional text messages had come in from the Defendant. Detective Harris again tried to set up a phone call between the Defendant and the victim. This time, the call was successful; the Defendant phoned the victim at her behest. A recording of the phone conversation was entered into evidence.

In the phone call, the victim told the Defendant, "My mom is going crazy, we cannot have sex anymore." The Defendant said "okay," followed by "we didn't have sex." The victim asked, "Then what do you call it when you put your d--k in my mouth." The Defendant responded "that's not sex. Okay. I promise, we won't do it anymore. We can just be cool friends. Okay?" Later in the call, the Defendant asked, "You didn't tell anybody did you?" The victim said "no," and the Defendant replied, "okay, cool." The Defendant then started to talk about how he wants the victim to find God and confirmed with the victim that they can still be friends.

Detective Harris then obtained warrants for the Defendant's arrest. He was able to locate the Defendant at his residence. According to Det. Harris, upon his arrival, he observed that the residence and a vehicle parked at the house were consistent with the victim's description. The Defendant was taken to the police station for questioning. The Defendant was given his Miranda warnings and confirmed that his birthdate was June 16, 1981. The Defendant also verified his cell phone number. When Det. Harris "asked [the Defendant] a question relative to the case," the Defendant stated that he did not want to speak with Det. Harris.

Thereafter, Det. Harris issued a subpoena to Verizon Wireless for the Defendant's phone records from December 1, 2008, through February 24, 2009. Detective Harris also obtained the victim's phone records from Sprint. These records were entered as exhibits at trial. According to Det. Harris, there were approximately 4,011 text messages between the victim and the Defendant during this timeframe.

During many of the text messages, the Defendant and the victim were arranging to meet. Detective Harris read excerpts from the records of February 15th through the 20th:

The Defendant: "Yeah. I need something."
The victim: "What?
The Defendant: "Sex. Sorry I do."
The victim: "LOL. Sorry."
The Defendant: "Why you sorry? Not your fault. I just need to find someone
who wants to."
The victim: "Your wife."
The Defendant: "She don't want to and you don't either. I guess you don't want me.
Got to find someone who want[s] to."
. . . .
The Defendant: "Want to run away? Want to run away?
The victim: "I've been so tempted to it's not even funny."

The Defendant: "You don't want to with me. I want a wife and a girlfriend and I want to try one thing that's really nasty and you would not talk to me if I told you."

The victim: "Try me."

The Defendant: "I want to suck a d--k one time to see what it's like. Told ya." The victim: "Okay. There's nothing wrong with that."

The Defendant: "Yeah, but you don't want to marry me and let me have a girlfriend and let me suck d--k."

. . . .

The Defendant: "What's it like to suck c--k? Do you like it."

The victim: "Yeah, it's diff."

The Defendant: "You like sucking my c--k, honey?"

The victim: "I told you I did."

. . . .

The Defendant: "Yeah. Good point. So you going to let me have a girlfriend, huh?"

The victim: "Yep."

The Defendant: "Why?"

The victim: "Said you wanted one."

The Defendant: "That's my girl. You have to help pick one out because you will lick her p---y for—"

The victim: "K."

The Defendant: "Do you want to or no?"

The victim: "Don't know what you like."

The Defendant: "I want you to like p---y, but do you want to? I want you to like p---y but do you want to?"

The victim: "I guess."

. . . .

The Defendant: "Yeah. You can say no."

The victim: "Okay. Then that would be the only thing that I wouldn't do."

The Defendant: "I won't be happy though."

. . . .

The Defendant: "Okay. I really want to see you but you don't sound like you do."

The victim: "No, I do."

The Defendant: "You sure? Okay. If I suck a d--k you have to be there with me and watch, okay?"

The victim: "I don't know."

. . . .

The Defendant: "Okay. I'm so f--king horny right now."

. . . .

The Defendant: "You like me being horny?"

The victim: "Yeah, kind of."

The Defendant: "Yeah, hey I met a girl today perfect for what we talked about."

Detective Harris further testified that, in one text, the Defendant instructed the victim to erase his message. The victim also informed the Defendant in a text message that C.L. saw one of his texts asking to meet and that her mother "bought [her] story" about the message, but C.L. "was not giving up easy." Later, the victim[2] texted that she was changing at school for band practice, and the Defendant asked about other girls in the locker room with the victim, "Any good p---y in there?" They then discussed whether or not she had looked at the other girls while they were changing.

When the victim was texting the Defendant in Det. Harris's office on the February 19, the following exchange occurred:

The victim: "Well, I want to see you. I'm starting to really like having sex with you."
The Defendant: "We don't have sex."
The victim: "LOL. What do you call it then?"

The victim then asked the Defendant to call her, and the Defendant replied that he was unavailable. He also said, "I'm sorry this doesn't seem like you." The Defendant started to talk about God. He then noted that normally she never wanted to call him and said that he would not "be able to meet for two weeks, maybe longer."

On cross-examination, Det. Harris testified that the victim made the following statement regarding her meetings with the Defendant: "[H]e had told her that every time they saw each other they needed to have sex." The victim further relayed that each time they met, they engaged in either oral sex or intercourse. The victim did not say that there was anything unique about the Defendant's penis. The victim could not provide a specific date for their first sexual encounter. She did provide that the meetings at the boat dock usually occurred between 11:00 p.m. and 1:30 a.m. Detective Harris confirmed that, based upon the statements of the victim, there were approximately twenty-six occasions between January 11 and February 18 where she and the Defendant had sexual relations of some kind.

The Defendant testified in his own defense and admitted that he sent the text messages to the victim. However, he denied ever having intercourse or oral sex with the victim. According to the Defendant, the relationship with the victim never went beyond the improper texting stage; "it was just phone sex." On cross-examination, the Defendant testified that he never actually met with the victim and that they just pretended to set up a meeting via text

---

[2] At this point, the victim's mother had the phone and was pretending to be the victim.

messaging, serving to increase his arousal. The inappropriate text messaging was simply "role playing" according to the Defendant.

Sarah Harding, the Defendant's wife, testified that she and the Defendant usually went to bed between 10:00 p.m. and 11:00 p.m. According to Mrs. Harding, she was "a very light sleeper" and would wake up anytime the Defendant got out of bed. Mrs. Harding could not remember the Defendant ever getting out of bed at night and then leaving the house during the months of January and February 2009. She testified that "there's no possibility" the Defendant could "sneak out of the house" at night because they kept their bedroom door shut, so she would have heard it open. Furthermore, according to Mrs. Harding, the Defendant did not have any sexually transmitted diseases, and he had "two bumps on the bottom of [his penis] that you can feel when you're giving oral sex."

Laura Doyka, the Defendant's sister-in-law, testified that she lived with the Defendant and her sister at their Gallatin home during the months of January and February 2009. Her bedroom was above the garage. Every time the garage door opened, not only would she hear it, but her bed would shake, waking her up. Ms. Doyka testified that the Defendant and her sister almost always parked their cars inside the garage. Ms. Doyka stated that, during this timeframe, she did not remember any "specific incidents" of the garage door opening between 11:00 p.m. and 1:30 in the morning. She stated that she knew "there was not more than two times" that the garage door opened in the middle of the night because "if it happened more than once or twice [she] would have questioned the fact." She admitted that she was not "there every single night."

At the conclusion of trial, the State made the following election of offenses in closing argument:

I want to point out this is Count One of the indictment, on or about January 10th and on or about February 18th. This is the one that [the victim] testified that was intercourse by the boat dock in the woods. This is the first time that she remembers having intercourse since her trip to Florida.

Count Two, late January 2009, oral sex. This is the Count where [the victim] testified that she was in his bedroom when he invited her to the hot tub. Oral sex [the victim's] mouth on his penis.

Count Three, this is the next incident that she recalls, intercourse in the woods by the boat dock a couple of days after the first incident at the boat dock that she remembers.

-11-

Count Four, again, intercourse in the woods next to the boat dock, a couple of days after Count Three.

Count Five, again, oral sex, this is again, victim on the [D]efendant, in the woods by the boat dock. This is the time that she testified this was second time that she remember[s] having oral sex.

Count Six, this is the last time she recalled having oral sex, again, in the woods by the boat dock, early February 2009.

Count Seven, this was February 15th, this is the Count that we talked about earlier, February 15th going into the early morning hours of the 16th. Again, intercourse.

Count Eight, intercourse in the woods by the boat dock. This is the day her mother became suspicious and the day before she went to the Hendersonville Police Department.

Following the conclusion of proof, the jury found the Defendant guilty as charged in Counts One through Four, Count Six, and Count Eight. The jury found the Defendant not guilty of Count Five and guilty of the lesser-included offense of attempted aggravated statutory rape in Count Seven.

The trial court sentenced the Defendant to four years for the six aggravated statutory rape convictions and two years for the attempt conviction. The trial court further ordered that Counts One and Seven were to run concurrently with one another but consecutively to all of the remaining counts, resulting in a total effective sentence of twenty-four years in the Department of Correction.

Following the motion for new trial hearing, the trial court dismissed the verdict in Count Seven, determining "that the jury's finding that the Defendant was guilty of attempted aggravated statutory rape was inappropriate[.]"[3] The case is now properly before this court.

ANALYSIS

On appeal, the Defendant raises the following issues for our review: (1) whether the indictment was insufficient for failing to provide specific dates for the offenses; (2) whether the evidence was sufficient to sustain the convictions; (3) whether the trial court erred by

_____

[3] We must remand for entry of corrected judgments reflecting dismissal of Count Seven.

-12-

excluding testimony from an alibi witness; and (4) whether the trial court imposed an excessive sentence.[4]  We address each in turn.

*I. Defective Indictment*

The Defendant contends that Counts One through Six of the indictment were defective for failing to list the specific dates of the alleged offenses, thereby prohibiting him from preparing a proper defense.  Specifically, his claim of prejudice is as follows:

> [The victim] was certainly under the age of majority, but was not a child of tender years to whom a calendar is meaningless.  Since the State was able to elicit dates during direct examination at trial, then certainly specific dates for Counts One through Six could have been calculated through simple conversation with the victim for inclusion into the indictment. . . .  To fail to do so . . . is inexcusable, whether by oversight, neglect or by strategy; and rises to the level of trial by ambush.

An indictment or presentment must inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  In addition, Tennessee Code Annotated section 40-13-202 requires that an indictment

> must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000).  Our supreme court has held that an indictment is sufficient to satisfy notice requirements if it "contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense." Id. at 299 (citing State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997)).

Initially, the State argues that the Defendant has waived this claim by failing to include a transcript of the motion for new trial hearing as a part of the appellate record.  In his motion for new trial, the Defendant raised the following issues, among others:  (1) "[The victim] was unable, without specificity, to indicate dates of occurrences, thereby prohibiting

---

[4]  For the purpose of clarity, we have reordered the issues as presented by the Defendant in his brief.

the defense in determining possible alibi, facts or witnesses"; and (2) "In the absence of specificity of dates, Counts 3 and 4 of the indictment are duplicitous." In the order denying the motion for new trial, the trial court clearly states that it ruled on all issues "in detail in open court" except the allegation regarding a duplicitous indictment, which was taken under advisement. The trial court thoroughly addressed the duplicitous indictment issue in its order, concluding that the allegation had no merit. The trial court reasoned that the issue was not one of "duplicity" but of "multiplicity," and determined as follows:

> Upon considering the testimony of the victim, . . . and by examining the dates in Counts One, Two, and Three, [sic] it is clear that the testimony of the victim and the dates from the counts of the indictment set out three separate instances that are alleged in Counts One, Three, and Four. Count One alleges sexual intercourse between January 10, 2009 and February 18, 2009. Count Three alleges sexual intercourse in January 2009, and Count Four alleges sexual intercourse in January 2009. The victim testified that the first time that she recalled intercourse with the Defendant after she returned from Florida was at the boat dock. She confirmed that she had told Det. Harris that this event happened on the 11th of January. She testified that the second incident involving sexual intercourse occurred not long after the first occasion of intercourse, within a few days, at the boat dock. She testified that the third time that intercourse occurred was within a few days of the second act of intercourse at the boat dock.

However, the issue is not raised in terms of duplicity or multiplicity on appeal but rather simply that the lack of specific dates prevented him from preparing a defense, more akin to the issue presumably addressed by the oral findings of the trial court at the motion for new trial hearing. The State correctly notes that a transcript of that proceeding is not included in the record on appeal.[5] The appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. See Tenn. R. App. P. 24(b). If an incomplete record is presented to this court, the appellant risks waiving issues raised on appeal. The Defendant has arguably waived consideration of the issue for failing to include the motion for new trial transcript in the record on appeal.

The State also argues waiver because the Defendant did not raise any issue regarding the indictment before trial. At any time while a case is pending, a court may hear a claim that the indictment fails to show jurisdiction in the court or charge an offense. Tenn. R. Crim.

_____

[5] Oddly enough, a portion of the trial transcript entered as an exhibit at the motion for new trial hearing is included in the appellate record.

P. 12(b)(2)(B). All other objections to the sufficiency of the indictment must be made prior to trial, or the issue will be deemed waived. Tenn. R. Crim. P. 12(b)(2)(B), (f)(1); State v. Kennedy, 649 S.W.2d 275, 279 (Tenn. Crim. App. 1982), overruled on other grounds by State v. Holt, 691 S.W.2d 520, 522 (Tenn. 1984). The Defendant did not challenge the indictment prior to trial and does not allege that it fails to show jurisdiction or charge an offense. Moreover, as the State notes, the Defendant could have requested a bill of particulars if he needed further clarification regarding specific dates of the offenses, which he did not. Accordingly, we agree that this issue is waived.

Waiver notwithstanding, we also agree with the State that the indictment, specifying both a month and a year for each offense, was not defective. The Defendant asserts that the lack of specific dates prevented him from preparing a defense, specifically he contended in his motion for new trial, "in determining possible alibi, facts or witnesses." However, an indictment is not required to state the exact date an offense is alleged to have occurred unless the date of the offense is a material ingredient to the offense. See Tenn. Code. Ann. § 40-13-207; State v. Byrd, 820 S.W.2d 739, 740 (Tenn. 1991). "[T]he State need allege only that the offense was committed prior to the finding of the indictment or presentment." Byrd, 820 S.W.2d at 740. Moreover, we note that the State made the necessary election of offenses in its closing argument. The Defendant is not entitled to relief on the basis of this claim. See, e.g., State v. Clifford Eric Burgess, No. M2008-01370-CCA-R3-CD, 2009 WL 2433059, at *6 (Tenn. Crim. App. Aug. 10, 2009).

*II. Sufficiency of the Evidence*
The Defendant contends that the evidence was insufficient to sustain his six convictions for aggravated statutory rape. An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Regarding the Defendant's six convictions for aggravated statutory rape, the State was required to prove "unlawful sexual penetration of a victim by the defendant, or of the

defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least ten (10) years older than the victim." Tenn. Code Ann. § 39-13-506(c). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

In attacking the sufficiency of the evidence against him, the Defendant argues that "the jury acted irrationally." Specifically, he points to inconsistencies in the victim's testimony, noting that she could not provide much detail regarding specific dates for the offenses, that she was unsure if the Defendant ever ejaculated, and that she lied about being physically abused by her mother. According to the Defendant, the jury was "so inflame[d]" by the text messages "that their emotions overruled their reason and common sense." The jury obviously accredited the victim's testimony, however. It is well settled law in Tennessee that "the testimony of a victim, by itself, is sufficient to support a conviction." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Moreover, the jury was free to conclude that the text messages and the recorded phone call served to corroborate the victim's verison of events.

Here, the evidence supported the convictions for aggravated statutory rape. The victim testified that she and the Defendant had intercourse on at least four separate occasions and oral sex on at least two separate occasions. According to Det. Harris, the victim estimated that she had approximately twenty-six sexual encounters with the Defendant during the months of January and February 2009.

Issues of a witness's credibility are solely within the province of the jury. The proof reflected that at all relevant times, the victim was sixteen years old and the Defendant was more than ten years her elder. Under the relevant statutes, these events constituted sexual penetration of the victim by the Defendant and, therefore, aggravated statutory rape.

The Defendant spends much of his sufficiency argument discussing the prejudicial and offensive nature of the text messages, contending that they were so inflammatory as to preclude the jury from reaching a rational verdict. However, the Defendant never objected to the text messages at trial. See Tenn. R. App. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Additionally, the text messages were clearly relevant to the issues, corroborating the sexual nature of the relationship between the Defendant and the victim. The evidence is sufficient to support the Defendant's six convictions.

### III. Alibi Evidence

In the Defendant's next issue, he asserts that the trial court erred in prohibiting him from calling an alibi witness, eighteen-year-old Andrew Doyka, the brother of the Defendant's wife, Sarah Harding. Mr. Doyka would have testified that the Defendant was with him throughout the day and into the evening of February 18, 2009, the specific date alleged in the Count Eight of the indictment charging intercourse at the boat dock.

Tennessee Rule of Criminal Procedure 12.1 governs notice of alibi. Rule 12.1 provides, in pertinent part, as follows:

(a) State's Request and Defendant's notice.

(1) State's Request for Notice of Alibi Defense. A district attorney general who desires disclosure of a potential alibi defense shall serve the defendant with a written request to be notified of an intention to offer an alibi defense. The request shall state the time, date, and place at which the alleged offense was committed.

(2) Defendant's Notice in Response. On written request of the district attorney general under Rule 12.1(a)(1), the defendant intending to offer an alibi defense shall serve on the district attorney general a written notice of this intention.

(A) Content. The defendant's notice shall state:

(i) the specific place or places at which the defendant claims to have been at the time of the alleged offense; and

(ii) the name and address of each alibi witness on whom the defendant intends to rely.

(B) Timing. Unless the court directs otherwise, the defendant shall serve such notice within ten days of the state's request.

(b) State's Response to Defendant's Notice.

(1) Disclosure. If the defendant serves a notice pursuant to Rule 12.1(a)(2), the district attorney general shall disclose in writing to the defendant the name and address of:

(A) each witness on whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense; and

(B) each witness on whom the state intends to rely to rebut testimony of any of the defendant's alibi witnesses.

(2) Timing. Unless the court directs otherwise, the district attorney general shall serve this notice within ten days after receiving defendant's notice of alibi but in no event less than ten days before trial.

(c) Continuing Duty to Disclose. If before or during trial either party learns of the existence of an additional witness who should have been included in the information furnished under Rule 12.1(a)(2)(A) or 12.1(b)(1), that party shall promptly notify the other party of the name and address, if known, of such additional witness.

(d) Failure to Comply. If a party fails to comply with this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at the scene of the alleged offense. This rule does not limit the defendant's right to testify.

(e) Good Cause Exceptions. For good cause shown, the court may grant an exception to any of the requirements of this rule.

This rule is only triggered by the written demand for such a notice from the district attorney general. See Tenn. R. Crim. P. 12.1, Advisory Comm'n Cmts. As supplemented,[6] the record

---

[6] When this case was first before this Court, the record did not contain a written demand by the district attorney general for notice of an alibi defense. Ultimately, due to this omission, we reversed and vacated the Defendant's six convictions for aggravated statutory rape, reasoning that the reporting requirements of Rule 12.1 were triggered only by such a written demand, and granted plain error relief due to the trial court's exclusion of testimony from an alibi witness. See State v. Anthony S. Harding, No. M2011-00597-CCA-R3-CD, 2012 WL 6062855 (Tenn. Crim. App. Dec. 6, 2012). Thereafter, the State requested a rehearing and sought supplementation of the record to include the State's written "Discovery Response and Reciprocal Discovery Request" filed in the Sumner County Criminal Court on June 12, 2009. We granted the motion
(continued...)

on appeal contains a written demand by the district attorney general for notice of an alibi defense filed in the trial court on June 12, 2009.

Apparently on the first day of trial, a Monday morning, defense counsel informed the prosecutor that he planned to call Mr. Doyka. So prompted, the prosecutor moved to exclude the proposed testimony after the State presented its case-in-chief. During a jury-out hearing, the defense made an offer of proof concerning Mr. Doyka's proposed testimony.

Mr. Doyka's testimony revealed that the Defendant and Mrs. Harding brought Mr. Doyka to defense counsel's office on the Saturday before the trial was to begin the following Monday morning. Defense counsel had never spoken with Mr. Doyka before this meeting. Mr. Doyka testified that he, along with his younger twelve-year-old sister, spent the night at the Defendant's house on the night of February 17, 2009. According to Mr. Doyka, on the morning of the 18th, they awoke between 7:00 and 7:30 a.m. and had breakfast at the Defendant's house that morning. Being home-schooled, they then did their school work. Mr. Doyka testified that, after finishing his school work, his brother came to the house. He, his brother, and the Defendant left to go play disc golf. Mr. Doyka estimated that they left the house around 2:00 p.m. and later returned between 4:00 and 4:30 p.m. Upon their return from disc golf, Mr. Doyka and his younger sister played games and ate dinner with the Defendant and Mrs. Harding that evening. According to Mr. Doyka, his mother picked him and his younger sister up from the Defendant's house at approximately 9:00 p.m. Mr. Doyka testified that he was with the Defendant "most of" the day on the 18th. The trial judge asked Mr. Doyka why this day was significant to him, and Mr. Doyka responded that he remembered it after going over it with the Defendant. Mr. Doyka admitted that he talked with the Defendant about these details "not too long after the 18th of February."

The prosecutor averred that, just because defense counsel was unable to speak with Mr. Doyka until the Saturday before trial, the Defendant was not excused from the ten-day notice of alibi, given that the Defendant had previously discussed these details with Mr. Doyka. The trial judge stated that the prosecutor had "brought up" Rule 12.1 seeking exclusion of the testimony for failure to comply with its requirements and asked defense counsel "to speak to that [r]ule." Defense counsel responded, "Your Honor, I am under a continuing obligation to report to the State, as is the State." Defense counsel further provided that he did not have the prosecutor's home number, thus having no means to contact him over the weekend. The trial court then granted the request to exclude Mr. Doyka's testimony, ruling as follows:

---

[6](...continued)
to supplement and the petition to rehear based upon the supplemented record.

Okay. I appreciate the attorneys and I know the situation here, but this is potentially damaging evidence. But I can't -- I can't go into all that. Then there's a possibility of a significant impeachment here, too. But all that aside, I mean, I've got to consider Rule 12.1 here and, you know, what could have been done Monday morning. We could have been given the name of this [witness]. How he could be reached or even more significantly, introduction to the State and a more definite statement as to the terms and parameters of his testimony. The General could have had time over the last couple of days to kind of run something down and be ready for it one way or the other.

Now, if this testimony here is received, it's significant alibi testimony from 2:00 p.m. until 9:00 at night that night according to this witness, this defendant was with this witness during a time practically making it impossible if this witness is to be believed and if he's correct in his dates and so forth. It would make it impossible for the events to happen February the 18th.

Sometimes you just have to look at the Rules and you follow the rules. That's all I can do. . . . [The court then quoted Rule 12.1(d)].

I find that the District Attorney's Office had requested any Notice of Alibi, and I understand the significance of attorneys talking to witnesses and getting ready for trial, but I think we should have done a little bit more here to put the State on notice that this witness was absolutely ready to just obliterate any event that happened on February 18th.

Thereafter, the Defendant did not include the issue in his motion for new trial. Moreover, as previously noted, he did not include a transcript of the motion for new trial in the appellate record, which would show whether the issue was possibly addressed in some way at the hearing. On appeal, the State argues that the Defendant has waived this issue by failing to include it in his motion for new trial. We agree that the Defendant has waived plenary review of this issue on appeal.

Tennessee Rule of Appellate Procedure 3(e) states, in pertinent part, that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e); see State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial); State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim.

-20-

App. 1989); see also State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (observing that an issue is typically waived when it is raised for the first time on appeal). The Defendant does not request plain error review of this issue, and based on the supplemented record, we do not discern a basis for plain error review given the facts of this case. See Tenn. R. App. P. 36(b). Based on the foregoing, we conclude that Defendant has waived plenary review of this issue by failing to preserve it for appellate review.

*IV. Sentencing*

The Defendant challenges the trial court's sentencing determinations, taking exception to the imposition of the maximum sentence on each count and the imposition of consecutive sentencing. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that trial courts adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulate in the record its reasons for imposing the specific sentence. See State v. Bise, 380 S.W.3d 682, 705 n.41 (Tenn. 2012).

At the September 20, 2010 sentencing hearing, the presentence report was entered into evidence. The report reflected that the Defendant did not have a criminal record. The report also showed that the Defendant had a history of employment at restaurants and gas stations.

Lori Meyers testified that she was a clinical supervisor and therapist at the Sexual Assault Center in Nashville. Ms. Myers began counseling the victim in February 2009 and was still counseling her at the time of the sentencing hearing. The victim relayed to Ms. Myers that there were threats involved with the statutory rapes. When the victim first came to Ms. Myers' office, she was suffering from post-traumatic stress disorder, exhibiting such symptoms as nightmares, flashbacks, "[a] lot of anxiety," and "safety and trust issues." According to Ms. Myers, the victim progressed with therapy. When asked what the long-term effects might be on the victim, Ms. Myers replied, "A future of having some addictions, an addictive behavior, having eating disorders, having relationship difficulties. Chronic depression, anxiety. There can be suicidal ideations that are associated with that, which are thoughts of suicide. Some disassociation and generally, not functioning well and fully functioning in society." Ms. Myers confirmed that the victim had "suicidal ideations" over

the course of therapy. She stated that the victim continued to have "trust issues," which could "continue for quite a while." In May 2009, Ms. Myers wrote a letter to the victim's landlord detailing the victim's issues and Ms. Myers' concerns, and the landlord allowed the victim's mother out of the lease. A letter from Ms. Myers providing much of the same information was attached as an exhibit to her testimony.

Victim impact statements by the victim and her mother were admitted as exhibits to the hearing. The victim's mother testified the she had a "very good relationship" with her daughter prior to these events. The victim's mother stated that their relationship began to change when the victim began to have trust issues. She also noticed that the victim's relationship with her friends became "strained." After the victim started therapy, their relationship improved. When asked about how her daughter's trust issues developed, she replied that the victim's father was often away and that the Defendant "stepped into a father-figure role and then abused [the victim]. He abused her trust." Following a doctor's examination, the victim tested positive for the human papillomavirus (HPV). This virus, according to the victim's mother, would stay in the victim's "system forever" and was "one of the leading causes of cervical cancer."

The victim's mother then discussed the numerous days she had missed from work due to these events. She stated that this had impacted her financially, exhausting her leave time at work and resulting in her no longer being compensated for time off. She also had to "drain" a savings account to afford their move to a new place. The victim's mother also testified that she "held guilt" for failing to protect her daughter.

During a recent outing to a grocery store, the victim and her mother ran into the Defendant. According to the victim's mother, she "pushed [the victim] into the back part of the bakery section[, and the victim] just stood up against the wall shaking." She then requested the maximum sentence for the Defendant, desiring "some safety" and "some peace of mind."

The victim then testified. When asked about threats from the Defendant, the victim replied that he told her that if she ever moved "he would find [her] and that [she] belong[ed] to him." He also said that she could not tell anyone about these events because they would both "get in trouble." According to the victim, some of the Defendant's text messages had "threatening undertones."

The victim noted that her relationship with her friends began to change when she started to have a sexual relationship with the Defendant and that she started to "withdraw [her]self from everybody." She also relayed that she "pulled [her]self away from" her mother. She agreed that she had progressed with therapy, only occasionally having

-22-

nightmares now. The victim then discussed her trust issues and safety concerns, knowing she could run into the Defendant at any moment. Furthermore, she testified that she had been greatly affected by the loss of her virginity to the Defendant and her HPV diagnosis.

Richard Harding, the Defendant's father, then testified about ear surgery that the Defendant required as a child and about multiple awards the Defendant received for playing high school football. The Defendant's mother passed in 1997, when the Defendant was in high school. Although he was highly recruited, the Defendant never played football at the college level because "[h]e skipped the SATs and that made him ineligible." Although the Defendant expressed "remorse that he made a mistake," he never admitted to his father that he engaged in any physical contact with the victim. The Defendant's father asked for leniency, noting that the Defendant was remorseful and wanted to get help.

The Defendant then testified. According to the Defendant, he anticipated that he would require another ear surgery in the near future. The Defendant said that, prior to trial, he had sought medical treatment for the skin tags on his penis. The Defendant had a record from his doctor noting his treatment for these skin tags, which was entered into evidence.

According to the Defendant, at the time of sentencing hearing, he was working full-time at Chili's restaurant for forty to forty-five hours a week and going to school full-time, taking fifteen credit hours. He testified that he was currently attending Middle Tennessee State University (MTSU) and that he had transferred there from Volunteer State Community College in order to obtain a Bachelor's Degree in the school of Business Administration. The Defendant stated that he had been selected by MTSU for enrollment in The National Society of Leadership and Success. A letter from the society student president was entered as an exhibit.

The Defendant admitted that the text messages he sent to the victim were "disgusting" but claimed that they were "not typical" behavior for him. He then stated that he was very "ashamed" of his actions but denied ever touching the victim. He asked "for professional assistance in getting better at this sex addiction with text messaging." He testified that he had not made any attempts to contact the victim.

The trial court inquired about the Defendant's involvement in "sexting relationship[s]" with other women. According to the Defendant, while he had engaged in this type of behavior before, the victim was the only one he was not also in a physical relationship with. The trial court also asked the Defendant why he did not mention his sex addiction during the psychosexual evaluation, and the Defendant simply responded that "[he] wasn't asked." The trial court noted that, in the report, it was stated that the Defendant denied ever fantasizing

about or masturbating to thoughts of the victim, but at trial, the Defendant told the jury that he masturbated while "sexting" the victim.

Dr. Donna Moore conducted a psychosexual evaluation of the Defendant, and her report was entered into evidence. In the test results section of the report, Dr. Moore concluded,

> It should be noted that [the Defendant], despite the lowering of test scores, had highest scores on a scale that measures traits of psychopathic deviance. Persons who score high on this scale have stormy relationships with family members and poor work histories. They are interested in others for what they can get from the relationship. They strive for immediate gratification and act without considering the consequences for others. . . . They may be perceived as good candidates for therapy but prognosis for change is poor as they are generally unable to accept blame for their problems.

As for his risk assessment, Dr. Moore found that the Defendant's "risk for sexual recidivism should be considered to be in the low category."

After considering the foregoing, the trial court sentenced the Defendant to four years on each count and ordered consecutive sentencing on all six of the remaining counts. The Defendant alleges that the trial court erred in these determinations. The Defendant's only specific asserted error is that the trial court failed to consider that he "is at low risk for engaging in sexually inappropriate behavior in the future[, which] abrogates the presumption of correctness[;] . . . [t]herefore, this [c]ourt may conduct its de novo review of all the evidence presented at trial and the sentencing hearing[.]" The State responds that the record supports the sentence as imposed.[7]

*A. Length of Sentence*

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing. Bise, 380 S.W.3d at 708. Currently, upon a challenge to the length of the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime

---

[7] The State, in its brief, also discusses whether trial court properly imposed a sentence of confinement, but because the Defendant did not raise this issue on appeal, it is waived and will not be addressed in the opinion.

and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

Our amended Sentencing Act no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

> (d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d) (emphasis added).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 760. In accordance with the broad discretion now afforded a trial court's sentencing decision,

> misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the

purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

The Defendant was a Range I, standard offender who was convicted of six Class D felonies; therefore, he was subject to a sentence between two and four years on each count. See Tenn. Code Ann. § 40-35-112(a)(4). The trial court enhanced the Defendant's sentences to the maximum within the range. The trial court found that two enhancement factors applied: (7) The offense was committed to gratify the Defendant's desire for pleasure or excitement; and (14) The Defendant abused a position of trust. See Tenn. Code Ann. § 40-35-114 (7), (14). The trial court also found that the "catch-all" mitigator applied and noted that the Defendant did not have a criminal record, giving it "some weight." See Tenn. Code Ann. § 40-35-113(13).

After determining that these enhancement and mitigating factors applied, the trial court made the following statement: "But these things all change with the advent of Carter versus the State of Tennessee. . . . The [s]upreme [c]ourt held that these factors are just guidelines that we're to follow, and we're not to do it the way we used to do where you go up and down based on mitigating and enhancement factors." The trial court went on to quote from Carter, "The [t]rial [c]ourt is free to select any sentence within the appropriate or applicable range, so long as the length of the sentence is consistent with the purposes and principles of the [S]entencing [A]ct." The court then enumerated the purposes and principles of sentencing found in sections 40-35-102(1), (3) and 40-35-103(5), and went on to apply them as follows:

So let's look at those factors for just a second. I've considered the imposition of a sentence justly deserved in relation to the seriousness of the offense. It doesn't get much more serious, other than child rape, as to what's happened here.

A punishment sufficient to prevent crime and promote respect for the law, and we will talk about that further.

And, in consideration of the [D]efendant's potential or lack of potential for rehabilitation. I am very concerned about his potential or lack of potential for rehabilitation. That's why I asked him the questions that I asked him on cross-examination. He places a great weight on an addiction that I think is only the product of his own imagination. That he's using to deal with certain conflicts in his life, specifically, a conflict of image, trust of family, wife,

parent, father, and others. This addiction he has developed, and I asked him today point blank about who he's sexted with others and really couldn't remember his girlfriends and so forth.

. . . .

So I think that you've really got some issue with truth, and, as long as those issues persist, I don't see any prospect of rehabilitation. I think reviewing some of the things that came forth in this trial is pretty important in dealing with this issue. Because how can you rehabilitate somebody that hasn't done any wrong. I'm looking at these text messages, and I'm considering the relationship here between a 16 year old girl and a 27 year old man.

. . . .

This is in the gutter of life. A 27 year old man who is married talking like this, much less having a sexual relationship with a 16 year old girl. . . .

We talk about evidence here. Look at what this man says. You don't talk like this; you don't have an addiction . . . . You were using, and you were greedy and you were abusing this little 16 year old girl.

. . . .

Dr. Moore's comments, I think are very, very significant. He had high scores on the scale that measures traits of psychopathic deviance. Persons who score high on this scale have stormy relationships with family members and poor work histories. Wonder who that relates here? They are interested in others for what they can get from the relationship.

. . . .

So his lack of potential for rehabilitation is nothing. I don't see any potential for rehabilitation on somebody that doesn't really come to grips with truth.

In rendering its length determination, the trial court states, "[s]o considering all that and the three factors in Carter," and then orders the maximum sentence of four years on each count.

Given the new directive of <u>Bise</u> from our supreme court, upon a challenge to the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." <u>Bise</u>, 380 S.W.3d 707. Because the application of enhancement and mitigating factors to adjust a sentence was rendered advisory by the 2005 amendments, we reiterate that the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. The trial court in this case thoroughly considered the purposes and principles of the Sentencing Act in rendering its decision; therefore, the imposition of the maximum sentence in the range is affirmed.

*B. Consecutive Nature*

The Defendant also challenges the consecutive nature of his sentences. Here the trial court imposed consecutive sentencing, finding that,

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]"

<u>See</u> Tenn. Code Ann. § 40-35-115(b)(5). Only one criterion need exist to support the appropriateness of consecutive sentencing. However, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2) and (4).

Here, the Defendant was convicted of six offenses involving sexual abuse of a minor, and the trial court considered the aggravating circumstances surrounding his conduct. The trial court properly relied on the "continuing" nature of the relationship; that the abuse involved both intercourse and oral sex, happening "almost every other night"; and that the victim suffered physical and mental damage from the abuse, suffering from post-traumatic stress disorder, requiring counseling, and contracting HPV.

The presence of a single factor is enough to justify the imposition of consecutive sentences. We affirm the trial court's imposition of consecutive sentencing.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court. We remand solely for the entry of corrected judgment forms to reflect dismissal of Count Seven, the attempt conviction.

_____
D. KELLY THOMAS, JR., JUDGE